NUMBER 13-01-288-CR

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

 



 

CLYDE LAVOY SIMMS,                                                         Appellant,

 

                                                   v.

 

THE
STATE OF TEXAS,                                                          Appellee.

 



 

                        On appeal from the 377th District Court

                                  of Victoria
County, Texas.

 

 



                                   O P I N I O N

 

          Before Chief Justice Valdez and Justices Yañez
and Castillo

                                  Opinion by Justice Castillo

 








Appellant Clyde Lavoy
Simms was convicted by a jury of the first degree offense of aggravated assault
with a deadly weapon in retaliation against a person who reported the
commission of a crime,[1]
found to be a habitual felony offender,[2]
and sentenced to life in prison.  Simms
appeals his conviction and sentence, asserting in two issues that the trial
court erred by: 1) denying his motion for new trial; and 2) allowing him to be
tried with a large number of deputies in the courtroom.  We affirm.

Factual Background

On October 19, 1999,
Amanda Simms filed a robbery complaint against appellant with the Victoria
Police Department.  She had been married
to appellant for approximately three years at the time and had had an affair
during the marriage.   Earlier that year,
appellant had been released from prison and in June had begun smoking crack
cocaine and the marriage suffered.  On
September 8,1999, appellant took her against her will up to Austin but she did
not file charges against him because she was told she had to do so in Travis
County.  Appellant had stayed in Austin
but Amanda Simms had returned to Victoria with her daughter who went to pick
her up.  Appellant kept his wife=s car in San
Antonio.  Some time later[3]
appellant came back to Victoria and took her daughter=s car and on October
18, 1999, the San Antonio Police Department called and told her that the car
had been impounded and had been severely wrecked. 








Some time prior to
this incident, in early October, appellant had overpowered her in her daughter=s car and had asked
her for money.  When she told him she had
none, he moved as to go into her jeans pocket. 
She pulled out six dollars and began bargaining with him.  He twisted her hand and took the money and
the keys to the car.  Appellant kept
calling her collect from out of town and she accepted the calls because he had
earlier Apromised@ to kill her and her
daughter.  During the calls he asked if
she had filed a robbery charge against him and then told her that he had
learned that she had. 








Appellant was later
arrested on the robbery charge.  On
November 16, 1999, Amanda Roessler, then a deputy with the Victoria County
Sheriff=s Department whose
duties included escorting prisoners to and from doctor=s appointments,
transported appellant to his doctor=s appointment near
Regional Medical Center in Victoria.  She
transported appellant without handcuffs or leg irons as he had a cast on his
foot and needed free hands to manipulate his crutches.  After they entered the doctor=s office and Roessler
noticed the large number of people in the waiting room, she asked the nurse if
they could be placed in a room away from the public.  They were taken to a separate room.  Appellant left and returned twice, for an
x-ray and to use the restroom.   While
waiting in the room for further medical attention, appellant struck Roessler
with something and she fell to the ground, striking her head.  She screamed and crawled to the door.  When she looked up, she saw appellant
pointing her own gun at her face and demanding the keys to her car.  She gave him her keys and appellant then ran
down the hall, without his crutches, in the opposite direction from which they
had entered the building.  A medical assistant
heard the scream, ran over and saw appellant with the gun, demanding the
keys.  When appellant turned around, the
medical assistant ran down the hallway and out the door.  Roessler later saw appellant exiting out the
back door of the building, away from the parking lot which was in the front of
the building. 

Adrian Saenz, a lab
technician at Victoria Regional Medical Center was carrying lab results from
the lab to the emergency room when, through some glass exterior doors, he saw a
person in Aorange jail scrubs@ run out of the
Professional Building behind the medical center, cutting across the grass, with
no deputy around.  After dropping off the
lab results, Saenz proceeded toward another door with a window to see if the
man was still running when he heard Afirecrackers@ and then, through the
window in the door,  saw a glint of
orange run by and saw smoke, at which point he realized he had heard gunshots
in the clinic area.  Saenz took off
running, still hearing gunshots, until he made it to the director=s office where he
asked the director to call 911.  After the
director and he made the call, they went to the front of the building and
learned that the man had left the building, but a woman had been shot. The
woman worked in the admitting area of the emergency room. The shooting had been
witnessed by another woman, Deborah Branch, who also worked in the medical
center. 








Ray Alexander, a field
security officer for the Texas Department of Corrections,  was in one of the exam rooms of the emergency
room at the time accompanying his wife. 
He was in full uniform except for his gun.  While there, he heard a noise which others
described as firecrackers but he disagreed and went to investigate.  In the entrance area of the emergency room he
saw a man, whom he identified as appellant, in an orange uniform pointing a
pistol down at someone and recognized him as an inmate. Appellant turned and
exited the building toward the parking area and Alexander chased after
him.  At one point appellant turned and
pointed the pistol at the officer and the officer stopped, put up his hands,
and gave up the chase, recognizing that he had only heard four or five shots
and so appellant might still have ammunition.  
Appellant got into a sheriff=s department vehicle,
put it into reverse, ran  over some
bricks or blocks, and then drove by the officer, waving to him.  Alexander ran back inside and made sure law
enforcement had been contacted, preserved the crime scene, and checked on the
medical treatment of the woman who had been shot. 

Milton Hobbs was just
leaving a gas station across from the medical center when he saw a sheriff=s car turning so fast
that it was almost on two wheels, being driven by a man in an orange suit.  Since this seemed wrong to him, he started
following the man who proceeded out to the highway, but by the time he caught
up to him, the man had wrecked the car and run it into a ditch, apparently
while attempting to make a turn.  Hobbs
called 911 on his cell phone and tried to flag down a car.  Appellant flagged down another car and made
the man get out at gunpoint and the man headed over to Hobbs=s car.   When appellant took off in the hijacked
vehicle, Hobbs followed him but lost him near a grocery store.  Hobbs was describing everything to the 911
operator on his cell phone.

A police officer saw a
car matching the description sent out by the dispatcher and then noticed
appellant driving the vehicle, wearing an orange jumpsuit.  After 
chasing him for some time, appellant stopped.   Appellant stuck his hand out the window and
dropped the gun onto the ground before he exited the vehicle and dropped to the
ground, all in response to another officer=s commands.  He was then taken into custody by deputies
from the sheriff=s department.  













On the way back to the
sheriff=s department,
appellant spontaneously asked, ADid I hurt her?@ The transporting
deputy, Robert Ontiveros, told appellant to wait a minute and then administered
the Miranda[4]
warnings.  The deputy then told appellant
that, as far as he knew, appellant had not done anything to cause harm to the
officer (Amanda Roessler) to which appellant responded, AI=m talking about my
[expletive] wife. I know I had to have hit her.@  The
deputy did not know what appellant was talking about and asked appellant to
clarify, to which appellant said, AI busted her in her
collard green eating [expletive] four times and I know I had to have hit her.@ Still confused, the
deputy asked appellant what he was talking about and appellant told him, AI was a U.S. Marine
Corps recon sniper and I could shoot, so I know I had to have hit her in her
big, black [expletive].@  The deputy then asked him where that happened
and appellant said that she had been working in the emergency room at the
hospital and that was where he had gone immediately after taking the gun from
Deputy Roessler and that he had fired the shots.  Appellant told Ontiveros that he knew he was
going up to the medical center for a doctor to check his leg, and knew that Athat  [expletive] sat there,@ so that when he got
the chance, he took the Alady cop=s@ gun from her holster
and said, AThis ain=t for you, this is for
that [expletive].@ Appellant had
explained that he had been arrested in San Antonio for unauthorized use of a
motor vehicle and robbery of Amanda Simms and was upset because she had filed a
report against him, stating, AIf I=m going to prison, I=m going for something
I did, not for a [expletive] lie.@  When the deputy asked appellant why he had
hurt his wife, he stated, ABecause she=s a lying [expletive]@ and then explained
about San Antonio, declaring, AIt was all a lie.@  Appearing happy and proud of what he had
done, appellant boasted to the deputy and told him that he had intended to go
back to the home where Amanda and he had lived, Ause the last bullet,@ and leave a note
telling her AThis is what you have
caused.@  It sounded to the deputy that appellant had
the whole scheme planned ahead of time out of revenge because appellant felt
his wife had made a false report against him which caused him to be arrested. 

Appellant also gave a
videotaped confession to another deputy sheriff in which he repeatedly stated
that his wife was lying and he had been arrested because of her lie.  He also stated repeatedly that he did not
intend to kill her or hurt anyone else and was only trying to hit his wife in
the leg and buttocks.  As a result of the
shooting, Amanda Simms was rendered a paraplegic with no movement or
sensitivity in her lower extremities.[5]

 The Motion for New Trial/Brady
violations

Appellant=s first issue
complains of the trial court=s denial of a new
trial urged by the defense on the ground that the State, in violation of Brady
v. Maryland, 373 U.S. 83 (1963), failed to produce to the defense a
dismissed complaint against Amanda Simms for the filing of a false report.[6]








A prosecutor has the
affirmative duty to disclose all material evidence that is favorable to the
accused. Brady, 373 U.S. at 87-88. 
Failure to do so results in a violation of the due process clause of the
Fourteenth Amendment.   Id. at
87.  The test that is used in determining
whether such a violation has occurred is Awhether the
prosecutor: (1) failed to disclose evidence; (2) favorable to the accused; and
(3) the evidence is material, meaning there is a reasonable probability
that, had the evidence been disclosed to the defense, the result of the
proceeding would have been different.@ Little v. State,
991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

We will consider first
the last of these requirements.  The
complained-of evidence consisted of a complaint charging Amanda Simms with the
making of a false report for the theft of a vehicle on October 31, 1999 when in
fact she had lent the vehicle to a friend who had not returned it to her.[7]  The complaint was filed in November of 1999
and dismissed a week later.  Appellant
argues that it is material by Avirtue of going to
Appellant=s ex-wife=s dastardly motives
for getting Appellant into trouble with the law@ and argues that it Acasts material light
on Appellant=s motives, state of
mind and knowledge and intent.@  








We are not convinced
that the disclosure of this evidence would, in all reasonable probability, have
caused the outcome of this cause to be different.  We disagree that such evidence provides any
material light on Amanda Simms=s motives[8]
for filing the report against appellant. 
Nor do we think that it provides any material evidence as to appellant=s actions.  A complaint of which appellant was unaware
could not possibly have affected his motives, state of mind, knowledge or
intent.  

Appellant also argues
that the evidence of the false report would have shown that appellant was
correct in his complaint that the robbery accusation was false because it would
have demonstrated that Simms had a tendency to lie and file false reports
against men.[9]  Accepting appellant=s arguments, this
evidence actually reinforces the State=s case, as it supports
appellant=s statements, admitted
at trial, that his shooting of Amanda Simms was an intentional act of revenge
in retaliation for her lying about him.  








In sum, we do not find
that the complained-of evidence was material for Brady purposes.  The jury was well aware that it was appellant=s contention that
Amanda Simms had lied about the report against him for robbery and that,
because of her making a false report, appellant felt justified in his
actions.  There is no question of
appellant=s motives, state of
mind, knowledge or intent and the evidence is overwhelming that he knowingly
and intentionally shot Amanda Simms in retaliation for filing a criminal
complaint against him.  As appellant has
failed to prove that disclosure of the complained-of evidence to the defense
would have caused the outcome of the case to be different, the trial court did
not err in failing to grant a new trial based on Brady violations.  We overrule appellant=s first issue.

The Deputies








Appellant=s second complaint is
that the trial court erred in allowing him to be tried with a large number of
deputies surrounding him during the trial. 
Appellant cites us to a portion of the record in which defense counsel asks
a defense witness about the large number of deputies in close proximity to the
defendant[10]  and argues that the Acloud of deputies@ placed him in an
unfair and prejudicial light.  For legal
authority, appellant cites Gammage v. State, 630 S.W.2d 309, 320 (Tex.
App.BSan Antonio 1982, pet.
ref=d)(error for defendant
to be handcuffed and shackled at trial unless there were shown to be
exceptional circumstances or manifest need) and Hernandez v. Beto, 443
F.2d 634, 636 (5th Cir. 1971)(error for defendant to be tried in jail clothes).


The State responds
that the presence of armed guards is not inherently prejudicial and so
appellant must show actual prejudice, citing Sterling v. State, 830
S.W.2d 114, 117-18 (Tex. Crim. App. 1992), which, the State argues, appellant
has failed to do. The State also argues
that appellant did not preserve error.               We agree with the State=s latter contention
and find that appellant has not preserved error, if any, in the trial court=s action.  Appellant has not pointed out anywhere in the
record where he made any objection to the presence of the deputies, however
many there were, nor have we found any such objection, either at the  guilt/innocence or the punishment phase.  We find, therefore, that appellant  has not preserved this issue for our
review.  Tex. R. App. P. 33.1(a).         

Furthermore, unlike
the shackling and handcuffing of a defendant at trial in Gammage, or the
trying of a defendant in prison garb in Hernandez,[11]
the presence of armed guards during a trial is not inherently prejudicial and
thus a defendant who wishes to assert error in the trial court must demonstrate
actual prejudice.  Holbrook v. Flynn,
475 U.S. 560, 569 (1986); Sterling, 830 S.W.2d at 118.   In the present case, even if the issue had
been preserved, appellant has failed to demonstrate any actual prejudice, or
any lack of due process, arising from the presence of law enforcement officers
at the trial and so has not demonstrated any error.  Sterling, 830 S.W.2d at 118.  Appellant=s second issue is overruled.








Conclusion

          Having overruled both of appellant=s issues, we affirm
the judgment of

conviction.                                                            

ERRLINDA CASTILLO

Justice

 

Do not publish.

Tex. R. App. P. 47.3(b).

 

Opinion delivered and filed

this 8th day of
August, 2002.











[1] Tex. Pen. Code Ann. '' 22.02(a)(2),(b)(3)(Vernon1994).





[2]
Tex. Pen. Code Ann. ' 12.42(d)(Vernon Supp. 2002).





[3]
Amanda Simms testified that this occurred sometime in early September of 1999,
although this was inconsistent with later testimony given.





[4]
Miranda v. Arizona, 384 U.S. 436 (1966).  





[5]
The defense presented no witnesses or evidence at the guilt/innocence phase.





[6]
Appellant also submits, under the argument in his first issue, in a single
sentence and without citing any authority, that the withholding of the
documents complained of Aviolated his
due process rights pursuant to Appellant=s
motives, state of mind and knowledge and intent, all key elements in Appellant=s
trial defense.@  We do not find this to adequately raise an
issue, distinct from that already raised in the Brady claim, which we
can review and so do not address it as a separate issue. See Tex. R. App. P. 38.1(h)(brief must
contain a clear and concise argument for the contentions made, with appropriate
citations to authorities and to the record).

 

We also do not find another argument mentioned in this issue
relating to the effective assistance of counsel to be raised as a claim
separate from the Brady claim. 
Appellant cites no case law, not even case law setting out the standard
for reviewing ineffective assistance of counsel, nor does he cite to any
portion of the record. He merely complains about the State=s
alleged violation of Brady which he argues Aprohibited@
his counsel from effectively assisting him, as counsel did not have an
opportunity to evaluate, assimilate or use the evidence.  He does not, however, raise any complaint
about any specific action or inaction on the part of his counsel which he
claims was ineffective.  We take this
passing reference then to be part of appellant=s
argument that the State=s alleged
violation harmed him, rather than a separate claim for ineffective assistance
of counsel.  Tex. R. App. P. 38.1(h).





[7]
According to the attached statement of Amanda Simms, she had rented a vehicle
for a friend to take his mother to Houston. 
He was supposed to return the vehicle to her the next day and she was
going to drive it the rest of the week. 
When he did not return it to her, she went looking for him and when she
ultimately found him, and demanded the car, he told her he did not know where
the car was and suggested that she report it stolen, which she did, Abecause
[she] was scared@ that she might
get into trouble if it was in fact stolen. 
Later, the friend told her that he had wrecked the car and told her
where it was.  After she located it, she
called 911 and reported that she had found the car.





[8]  This is assuming, for the sake of argument,
that such motives would even be relevant at all.





[9]
We note that at trial, despite the defense strategy of showing that appellant
was upset, not thinking straight, and felt Ajustified@
in shooting Amanda Simms because Ashe
lied on him,@ defense
counsel made no attempt during the cross-examination of Amanda Simms to
challenge the veracity of the robbery complaint,  or the credibility of the witness herself,
other than to ask if the six dollars taken wasn=t
actually community property and to ask how many times she had been to
prison.  On appeal, appellant does not
argue that the evidence could have been used to challenge her general
credibility as a witness but instead argues that it could have been used to
show her @motive@
for filing a false report against him and to show his motives, state of mind,
knowledge and intent in shooting her. 





[10]
The reference occurred during the punishment hearing in the direct examination
of a Victoria County Deputy Sheriff called by the defense to testify that
appellant was not a discipline problem in the jail.  The relevant portion of the exchange is as
follows:

 

Defense Counsel:   I notice we have a lot of people here from the Sheriff=s
Department and we=ve had them
throughout the trial?

 

Witness:                 Yes,
sir.

 

Defense Counsel:   So, for some reason, there=s
been a large number of deputies within three feet of him all the time.

 

Witness:                 Yes,
sir.

 

Defense Counsel:   And yet, this is a person that hasn=t
done anything except for the underlying charge, by escaping from one of the
Sheriff=s deputies?

 

Witness:                                 Right.  In the - - Right.  In his case, his actual charge, we take extra
precautions at times.

 





[11]
However, a defendant must object to being tried in prison or jail garb below
before he can claim error on appeal.  Estelle
v. Williams, 425 U.S. 501, 512-13 (1976); Mitchell v. State, 989
S.W.2d 747, 749 (Tex. Crim. App. 1999).